[No. B035188. Second Dist., Div. Three. July 26, 1989.]

ROSSCO HOLDINGS INCORPORATED et al., Plaintiffs and Appellants v. THE STATE OF CALIFORNIA et al., Defendants and Appellants.

## COUNSEL

Joseph M. Gughemetti, David C. Spangenberg and Sherman L. Stacey for Plaintiffs and Appellants.

Ronald A. Zumbrun, Edward J. Connor, Jr., and John M. Groen as Amici Curiae on behalf of Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, N. Gregory Taylor, Assistant Attorney General, and Steven H. Kaufmann, Deputy Attorney General, for Defendants and Appellants.

OPINION

KLEIN, P. J.—Plaintiffs Rossco Holdings Incorporated, doing business as Quaker Corporation, (Quaker) and Michel T. Ghosn (Ghosn) (collectively, appellants) appeal the order of dismissal entered after the trial court sustained the demurrer interposed by the defendants, State of California (the State) and the California Coastal Commission (the Commission) (collectively respondents).[1, 2]

## SUMMARY STATEMENT

Appellants own substantial acreage in the Malibu-Santa Monica Mountains area of the County of Los Angeles (the County). Quaker holds title to the 227-acre Quaker property and the 102-acre Piuma property; Ghosn owns the 160-acre Ghosn property.

After the Commission imposed various conditions upon the development of the parcels, the appellants sued. Their complaint alleged the properties wrongfully had been included within the coastal zone of the Commission's jurisdiction and asserted the conditions were improper and excessive.

We shall conclude the trial court properly: (1) placed the properties within the coastal zone; (2) ruled the landowners must comply with Code of Civil Procedure section 1094.5 prior to, or in conjunction with, a claim for inverse condemnation; and, (3) found the Commission is not a "person" for purposes of federal civil rights violations.

However, we shall reverse the trial court's ruling that acceptance of a permit and compliance with its conditions does not constitute a waiver of the right to attack those conditions.

## FACTUAL AND PROCEDURAL BACKGROUND

We treat as true all properly pleaded allegations of the complaint for the purpose of an appeal from an order sustaining a demurrer. (*Thompson v. County of Alameda* (1980) 27 Cal.3d 741, 746 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701].) The trial court also appropriately considered matters which may be judicially noticed such as the background of the California Coastal Act of 1976 (the Coastal Act), its legislative history and subsequent attempts to modify it. (*Blank v. Kirwan* (1985) 39 Cal.3d 311,

---

[1] The County of Los Angeles and Santa Monica Mountains Conservancy are parties to the litigation but not to this appeal.

[2] Code of Civil Procedure section 581d provides that a written order of dismissal signed by the trial court and filed in the action constitutes a judgment.

318 [216 Cal.Rptr. 718, 703 P.2d 58]; Code Civ. Proc., § 430.70.) We shall do likewise. Allegations of the complaint which are inconsistent with, or contradicted by, judicially noticed facts must be rejected. (*Blatty* v. *New York Times Co*. (1986) 42 Cal.3d 1033, 1040 [232 Cal.Rptr. 542, 728 P.2d 1177].)

Preliminarily, appellants indicate certain causes of action dismissed by the trial court on the condition they be asserted in other lawsuits have been so asserted, and thus are no longer in issue in this appeal. The factual summary and procedural history here is limited to those matters which remain in dispute. The issues are: (1) the boundaries of the coastal zone; (2) the conditions imposed by the Commission on development of the Piuma property; and (3) federal civil rights claims pursuant to 42 United States Code section 1983 as to each of the three parcels respecting both the boundary dispute and the conditions imposed upon development.

1. *Allegations of the boundary dispute.*

Appellants claim their respective properties are not within the coastal zone established by the Coastal Act. In the area of these properties, the coastal zone is defined as "that land and water area . . . , specified on the maps identified and set forth in Section 17 of that chapter of the Statutes of the 1975-76 Regular Session enacting this division, . . . [I]t extends inland to the first major ridgeline paralleling the sea or five miles from the mean high tide line of the sea, whichever is less, . . ." (Pub. Resources Code, § 30103, subd. (a).)[3]

The maps referred to in section 30103, subdivision (a), drew the coastal zone boundary line in Malibu at the five-mile limit. Although appellants' properties are within this five-mile limit, they are beyond the first topographic elevation paralleling the sea. Appellants claim this topographic elevation constitutes a major ridgeline within the meaning of section 30103 and conclude their properties are not subject to the jurisdiction of the Commission.

Appellants seek damages for the wrongful imposition of jurisdiction by the Commission over their properties under theories of inverse condemnation, denial of due process and civil rights violations.

---

[3] All further statutory references are to the Public Resources Code, unless otherwise indicated.

2. *Allegations of improper conditions of development.*

 a. *The Quaker and Ghosn properties.*

Appellants contend the Commission imposed unreasonable conditions on development of their parcels. Regarding the Quaker property, these conditions, among other things, required Quaker to dedicate 200 acres of open space easement, reduce the number of residential lots on the property, create environmentally sensitive habitat areas and purchase transferable development credits (TDC's).

As to the Ghosn property, the complaint alleges the Commission delayed development in bad faith, arbitrarily changed and increased the severity of conditions it had approved in an earlier permit application, and improperly attempted to freeze the property as open space in order to facilitate its acquisition as a state or federal park.

Only the causes of action which allege these restrictions violated appellants' civil rights remain in issue.

 b. *The Piuma property.*

Quaker alleges the Commission restricted a County-approved development of the Piuma property by requiring Quaker to purchase 21 TDC's at a cost of $297,000. Quaker also claims it lost County approval of more valuable lots and was forced to dedicate a portion of its land as open space.

However, the complaint also states Quaker has complied with the conditions imposed by the Commission as to the Piuma permit by purchasing the TDC's and recording an offer to dedicate to a government. The complaint states that by virtue of the permit issued July 23, 1985, "Quaker was allowed to develop" the Piuma property subject to the referenced conditions.

As to the Piuma property, Quaker alleges inverse condemnation, denial of due process and civil rights violations, and requests declaratory and injunctive relief.

3. *The trial court's ruling.*

 a. *The boundary dispute.*

The trial court sustained the respondents' demurrer to the boundary dispute causes of action without leave to amend. It found the Legislature

intended the maps to define the coastal zone boundary, and concluded the Legislature's failure to amend the maps to the boundary advocated by appellants, despite the introduction of two bills specifically designed to accomplish that result, suggested an intent "to leave the law as it stands."

The trial court also referred to an opinion of the Attorney General (63 Ops.Cal.Atty.Gen. 107 (1980)) which concluded the landward boundary of the coastal zone is depicted on the maps, and is not stated in the general verbal description of the coastal zone found in section 30103.

### b. *Improper imposition of developmental conditions.*

The trial court ruled the Ghosn property causes of action had been misjoined and sustained the demurrer without leave to amend on that ground, but allowed Ghosn to assert each of these claims, except the federal civil rights action, in a new action.

The trial court sustained the demurrer without leave to amend as to the causes of action alleging arbitrary conditions upon the development of the Quaker and Piuma parcels on the ground section 30801 "contemplates review by administrative mandamus as the exclusive means to attack decisions of the Commission." However, the trial court allowed all the Quaker property causes of action, except the federal civil rights claim, to be added to a pending administrative mandate action.

The demurrers as to the Piuma causes of action were sustained "without leave to amend and without leave to file another action because no mandate actions were or are pursued with regard to that property." The trial court also found the 60-day statute of limitations in section 30801 barred an administrative mandate action respecting the Piuma conditions of development.[4]

However, as to these same Piuma property causes of action, the trial court overruled the demurrer interposed by the respondents on the ground

---

[4] Section 30801 provides in pertinent part: "Any aggrieved person shall have a right to judicial review of any decision or action of the commission or a regional commission by filing a petition for writ of mandate in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure, within 60 days after such decision or action has become final."

Code of Civil Procedure section 1094.5 provides for inquiry into the validity of a final administrative order by petition for writ of mandate to the superior court. Subdivision (b) of that section provides: "The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence."

Quaker's acceptance of the permit on the Piuma property and compliance with its terms constituted a waiver of the right to attack the conditions.

 c. *Alleged civil rights violations.*

The trial court sustained the demurrer without leave to amend as to all the civil rights violations. It found state agencies, such as the Commission, are not "persons" within the meaning of 42 United States Code section 1983.[5]

## CONTENTIONS

Appellants contend the trial court incorrectly determined the coastal zone boundary-jurisdiction issue and improperly dismissed the federal civil rights causes of action.

They also assert the constitutional right to sue in inverse condemnation cannot be conditioned upon a requirement that the landowner invalidate the administrative action which constitutes the taking before filing suit.

The State and the Commission have cross-appealed from the trial court's order overruling their demurrer interposed on the ground of waiver as to the Piuma property permit.

## DISCUSSION

1. *The Boundary Dispute.*

 a. *Historical perspective.*

In 1972 the electorate enacted Proposition 20, the Coastal Zone Conservation Act (the 1972 Coastal Act). (Former §§ 27000-27650.)

"The 1972 Coastal Act was an interim measure, destined by its own terms to expire at the beginning of 1977. It authorized the interim coastal commission to prepare a study summarizing the progress of planning in the coastal zone and delineating goals and recommendations for the future of California's shoreline for the guidance of the Legislature. The study, labeled

---

[5] 42 United States Code section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

the California Coastal Plan, was completed in December 1975 and submitted to the Legislature, which used it as a guide when drafting the California Coastal Act of 1976 [the Coastal Act] . . . . (Pub. Resources Code, § 30000 et seq.) The Coastal Act created the California Coastal Commission . . . to succeed the California Coastal Zone Conservation Commission." (*Pacific Legal Foundation* v. *California Coastal Com.* (1982) 33 Cal.3d 158, 162-163 [188 Cal.Rptr. 104, 655 P.2d 306].)

Section 30001 of the Coastal Act sets forth the legislative finding that the California coastal zone is a valuable natural resource of vital and enduring interest which exists as a delicately balanced ecosystem. In order to protect the coastal zone and prevent its further deterioration and destruction, the Legislature declared the need to plan carefully future development within the zone in a manner consistent with its permanent protection.

 b. *The area within the coastal zone.*

The Coastal Zone Conservation Commission had planning and permit authority over a coastal zone limited in Los Angeles to "the highest elevation of the nearest coastal mountain range or five miles from the mean high tide line, whichever is the shorter distance." (Former § 27100.)

The final version of the Coastal Act (Sen. Bill No. 1277), as last amended on August 12, 1976, defined the coastal zone as it is presently stated in section 30103, subdivision (a), i.e., "that land and water area of the State of California . . . , *specified on the maps* identified and set forth in Section 17 of that chapter of the Statutes of the 1975-76 Regular Session enacting this division, . . . In significant coastal estuarine, habitat, and recreational areas it extends inland to the first major ridgeline paralleling the sea or five miles from the mean high tide line of the sea, whichever is less, . . ." (§ 30103, subd. (a), italics added.)

Section 17 of chapter 1330 of the Statutes of 1976, page 6012, provides: "The coastal zone, as *generally* defined in Section 30103 of the Public Resources Code, shall include the land and water areas as shown on the attached map prepared by the California Coastal Zone Conservation Commission titled 'California Coastal Zone' dated August 11, 1976, and on file with the Secretary of State." (Italics added.) In the area of the subject properties these maps drew the boundary line at the five-mile limit.

 c. *The map boundaries control.*

 Appellants' complaint alleges the coastal zone boundary is significantly landward of the first major topographic elevation paralleling the

sea and therefore inaccurate. They claim the Legislature intended the boundary to be controlled by the topographic ridgeline standard and not by the maps, and allege the Commission's staff intended to mislead the Legislature by preparing the maps in violation of the statute in order to expand improperly the Commission's jurisdiction. We disagree.

The plain language of the statute does not support the contention the topographic standard is superior to the maps. The coastal zone is referred to as *generally* described in words and *specifically* defined by the maps. ■ A well-settled rule of statutory construction dictates that the specific must control over the general. (*Estate of Kramme* (1978) 20 Cal.3d 567, 576 [143 Cal.Rptr. 542, 573 P.2d 1369]; *People* v. *Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 637 [268 P.2d 723].) ■ Therefore, the boundary established by the maps must preponderate over the verbal description in the statute.

Our conclusion is buttressed by consideration of the same factors relied upon by the trial court. One such factor is an opinion of the Attorney General issued in 1980. ■ "Though clearly not controlling authority, the opinions of the Attorney General are accorded great respect by the courts. [Citations.]" (*Long Beach Police Officers Assn.* v. *City of Long Beach* (1988) 46 Cal.3d 736, 747 [250 Cal.Rptr. 869, 759 P.2d 504].)

■ The opinion discussed the landward boundary of the coastal zone and concluded "the Legislature clearly intended and did define the landward boundary to be the line depicted on the section 17 maps as subsequently modified by the commission and the Legislature. The quoted words are merely descriptive of the rationale used by the Legislature in drawing the particular line on the maps. [Fn. omitted.]" (63 Ops.Cal.Atty.Gen., *supra,* at p. 111.)

The subsequent modification referred to in the opinion of the Attorney General occurred in 1979. Effective January 1, 1980, the Legislature altered the coastal zone by enacting section 30166 which provides: "In Los Angeles County: [¶] (a) In three locations within the Santa Monica Mountains, the boundary is moved seaward to the five-mile limit described in Section 30103 and as specifically shown on maps 22, 23, and 24."

The trial court also took notice of two earlier legislative attempts to modify the boundary of the coastal zone to conform to the line advocated now by appellants. Senator Cusanovich introduced the first, Senate Bill No. 770 (1977-78 Reg. Sess.), on March 31, 1977. The Bill Analysis of Senate Bill No. 770 prepared by the Assembly Committee on Resources, Land Use and Energy *reported: "Proponents of SB 770 alleged that an error occurred*

in drawing the boundary of the Coastal Zone in the Santa Monica Mountains area. Specifically, they contend that the boundary was placed inland at the maximum five mile limit rather than at the 'first major ridgeline' as required by the Coastal Act. The Coastal Commission contends that the boundary was correctly drawn. The Commission acknowledges that the Coastal Zone boundary in the Santa Monica Mountains area was not placed at the *first topographic elevation* landward from the Pacific Ocean. The Commission contends, however, that the term 'ridgeline' does not refer to the first line of topographic elevation, but rather refers to the line which delimits a watershed or drainage area. The land in question is admittedly within the watershed area which drains into the Pacific Ocean."

On November 30, 1977, Senate Bill No. 770 returned from committee and the Assembly without further action.

On December 4, 1978, Senator Cusanovich introduced a second bill to move the coastal zone boundary seaward in the Santa Monica Mountain area. That bill, Senate Bill No. 39, failed passage in committee on July 17, 1979, and on November 30, 1980, returned from Assembly without further action.

Appellants argue the position taken by the Commission on Senate Bill No. 770 before the Assembly Committee on Resources, Land Use and Energy shows reliance on the topographic standard stated in the words of the statute. They also argue the 1979 modification of the boundary in Malibu to conform with the five-mile limit reflects the Legislature's intent that the written description of the boundary controls and not the maps. We disagree.

Neither the Commission's past justification of the boundary shown on the maps nor the Legislature's correction of the maps contradicts the view that the maps properly fix the border of the coastal zone. Rather, this history shows the Legislature twice has had the opportunity to set the coastal zone boundary at the first topographic elevation, but has chosen to leave it as placed in the maps despite an exhibited willingness to make other corrections. Further, it is reasonable to infer the Legislature based its failure to modify the boundary, at least in part, on the Commission's view that the watershed is the critical ridgeline, not the first topographic elevation.

Appellants also complain the trial court erroneously found the maps were available to the Legislature at the time it passed the Coastal Act. They argue the maps did not exist until August 11, 1976. Again, this assertion does not withstand scrutiny.

While the maps are referred to in Statutes 1976, chapter 1330, section 17, p. 6012, as having been dated August 11, 1976, it does not follow they did not exist before that date. Moreover, the Coastal Act did not pass the Assembly until August 13, 1976, and thus the maps were available for use by that body, even if they had not existed before August 11, 1976. Moreover, Sen. Bill No. 1277 did not return to the Senate until August 16, 1976, and thus the maps were available during the Senate's final consideration of the bill.

Lastly, appellants point to a selective quotation from the trial court's order and complain it establishes the trial court did not resolve the boundary line issue, but deferred the matter to the Legislature. However, the quotation relied upon by appellants merely prefaced the trial court's resolution of the matter as one of law. Thus, citation to *County of Alpine* v. *County of Tuolumne* (1958) 49 Cal.2d 787 [322 P.2d 449], and the claim the trial court erroneously concluded the judicial system lacked authority to resolve a governmental jurisdictional boundary dispute lacks any basis in the record.

We reiterate our conclusion that the trial court correctly ruled the coastal zone is defined specifically by the maps and only generally in the words of the statute.

2. *Allegedly improper conditions of Piuma property permit.*

 ■ a. *Quaker waived its right to attack the allegedly improper conditions of the Piuma permit by complying with them.*

The complaint concedes Quaker has complied with the conditions imposed by the Commission upon the development of the Piuma property, and that "Quaker was allowed to develop" the land subject to the conditions.

A landowner cannot challenge a condition imposed upon the granting of a permit after acquiescence in the condition by either specifically agreeing to the condition or failing to challenge its validity, and accepting the benefits afforded by the permit. (*County of Imperial* v. *McDougal* (1977) 19 Cal.3d 505, 510-511 [138 Cal.Rptr. 472, 564 P.2d 14].)

*Pfeiffer* v. *City of La Mesa* (1977) 69 Cal.App.3d 74, 78 [137 Cal.Rptr. 804], states the rule similarly: "It is fundamental that a landowner who accepts a building permit and complies with its conditions waives the right to assert the invalidity of the conditions and sue the issuing public entity for the costs of complying with them. . . . If the conditions imposed by the city in their permit were invalid, Code of Civil Procedure section 1094.5

provided plaintiffs with the right and procedures to eliminate them. By declining to avail themselves of those procedures, plaintiffs cannot convert that right into a cause of action in inverse condemnation."

Quaker argued, and the trial court found, that the United States Supreme Court case of *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141], overruled the *County of Imperial-Pfeiffer* rule. Because the *Nollan* case does not present the issue of waiver, we disagree.

The Nollans leased a beachfront lot situated between two existing public beaches. Their lease contained an option to buy conditioned on demolition of the existing 504 square foot bungalow. In 1982, the Nollans submitted a permit application to the Commission which proposed replacement of the bungalow with a three-bedroom house similar to those in the neighborhood. The Commission approved the permit on the condition the Nollans grant a public easement to cross over their beachfront.

The Nollans attacked the condition in a petition for writ of administrative mandate and the Ventura County Superior Court remanded the case to the Commission for a full evidentiary hearing. After the Commission again imposed the condition, the Nollans again sought administrative mandamus. The superior court granted the writ and struck the permit condition.

While the Commission's appeal in the Court of Appeal remained pending, "the Nollans satisfied the condition on their option to purchase by tearing down the bungalow and building the new house, and bought the property. They did not notify the Commission that they were taking that action." (*Nollan* v. *California Coastal Comm'n, supra,* 483 U.S. at pp. 829-830 [97 L.Ed.2d at p. 684].)

The Court of Appeal reversed the superior court and upheld the permit condition. However, the United States Supreme Court found the easement along the beach bore no relationship to the Commission's stated purpose of improving visual access to the beach, and concluded the permit condition constituted a taking.

*Nollan* is therefore factually distinguishable from *Pfeiffer* and *County of Imperial.* In both the latter cases, the landowner accepted and complied with the permit conditions. The Nollans, on the other hand, never accepted the public easement condition. To the contrary, they timely fought the condition all the way to the highest court in the land. Although they did build the home which was the subject of the permit proceedings, they did so

without notifying the Commission and while their battle with the Commission continued.

Because waiver was neither discussed nor in issue in *Nollan,* the trial court erroneously held *Nollan* abrogated the *County of Imperial-Pfeiffer* rule.

 b. *Quaker's failure timely to petition for administrative mandamus to invalidate the assertedly improper conditions on the development of the Piuma property precludes suit for inverse condemnation.*

Quaker concedes it never petitioned for an administrative writ of mandate as required by section 30801 and Code of Civil Procedure section 1094.5 (hereafter section 1094.5) to attack the conditions imposed by the Commission on the Piuma property. Quaker now claims its right to allege a "taking" derives from the Fifth Amendment of the federal Constitution, and cannot be restricted or restrained by a state rule which requires Quaker first to invalidate the condition.

Quaker bases this argument on the United States Supreme Court decision in *First Lutheran Church* v. *Los Angeles County* (1987) 482 U.S. 304 [96 L.Ed.2d 250, 107 S.Ct. 2378] (hereafter *First English*) which held both temporary and permanent takings require the payment of just compensation. In this regard, *First English* overruled *Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266 [157 Cal.Rptr. 372, 598 P.2d 25], which held a landowner confronted with an "as applied" regulatory taking could seek to invalidate the regulation by petition for writ of administrative mandate, but could not maintain an action for damages for the temporary taking. (*Agins* v. *City of Tiburon, supra,* 24 Cal.3d at p. 273; *Taylor* v. *Swanson* (1982) 137 Cal.App.3d 416, 418 [187 Cal.Rptr. 111].)

*First English,* however, did not address the *procedural means* by which a claim for inverse condemnation is asserted. It merely held "where the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide *compensation for the period during which the taking was effective.*" (Italics added.) (*First English, supra,* 482 U.S. at p. 321 [96 L.Ed.2d at p. 268].)

Thus, although the state can no longer insulate itself from payment of damages for a temporary taking, it does not follow that landowners no longer need to comply with the procedural steps required to contest the action of the administrative agency.

Nonetheless, appellants and amicus curiae urge *First English* requires the elimination of the longstanding rule that landowners must attack actions of the Commission in administrative mandamus. In a recently published opinion, the only other court to address this issue concluded a petition for administrative mandate under section 1094.5 remains a necessary predicate to institution of inverse condemnation proceedings. (*California Coastal Com.* v. *Superior Court (Ham)* (1989) 210 Cal.App.3d 1488 [258 Cal.Rptr. 567] (hereafter *Ham.*)[6]

We agree with the *Ham* holding that *State of California* v. *Superior Court (Veta)* (1974) 12 Cal.3d 237 [115 Cal.Rptr. 497, 524 P.2d 1281], "must be read as establishing as early as 1974 that an administrative mandate action was a necessary procedural predicate to seeking inverse condemnation damages *based upon a regulatory taking accomplished by an administrative agency. (Ham, supra,* 210 Cal.App.3d at p. 1494.) Indeed, even if a departure is in order after *First English,* appellants have not presented a record upon which to make such a change.

In supplemental letter briefs filed after issuance of the *Ham* opinion, appellants have taken the position that *Ham* cannot be harmonized with *First English*. Appellants point out that *Ham* failed to consider the difference in the burden of proof between administrative mandamus and inverse condemnation. ▆▆▆▆▆▆ They also argue the limited record a landowner is able to create in a Commission proceeding unfairly restricts the matters which can be brought to the attention of the trial court at the mandamus hearing and prevents proof of the elements of inverse condemnation.[7]

---

[6] As of the filing date of this opinion *Ham* is final as to the Court of Appeal. However, the period of time in which the parties may seek review in the California Supreme Court has not yet elapsed.

[7] It is well established that a "taking" may occur when land use regulation "goes too far." (*Penna. Coal Co.* v. *Mahon* (1922) 260 U.S. 393, 415 [67 L.Ed. 322, 326, 43 S.Ct. 158, 28 A.L.R. 1321].) Although a determination of what constitutes a "taking" under the Fifth Amendment must be made on a case-by-case basis, the United States Supreme Court has identified three significant factors to be considered. First, the economic impact of the government's action "and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations . . . ." (*Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104, 124 [57 L.Ed.2d 631, 648, 98 S.Ct. 2646].) Second, the nature of the governmental action, i.e., physical invasion versus interference with enjoyment arising from a public program which promotes the public good. (*Ibid.*) And, finally, governmental action which "may be characterized as acquisitions of resources to permit or facilitate uniquely public functions have often been held to constitute 'takings.' " (*Id.,* at p. 128 [57 L.Ed.2d at p. 651].)

On the other hand, "land use regulation does not effect a taking if it 'substantially advance[s] legitimate state interests' and does not 'den[y] an owner economically viable use of his land,' [citations]." (*Nollan* v. *California Coast Comm'n, supra,* 483 U.S. at p. 834 [97 L.Ed.2d at p. 687].)

Appellants assert: (1) the Commission lacks subpoena power to compel attendance of witnesses; (2) testimony received by the Commission is unsworn and not subject to cross-examination; (3) the Commission lacks a judicial officer to rule on evidentiary questions; and, (4) the Commission typically limits the time allotted for a landowner's presentation.

Drawn into a vacuum of their own making, appellants have requested we take judicial notice of a hearing before the Commission regarding an application to develop the Quaker parcel *unrelated* to these proceedings. We denied the request because the Quaker parcel is no longer in issue here. By failing to proceed as required by law, Quaker has foregone its opportunity to demonstrate the limitations of the administrative process now asserted.

Indeed, as far as can be determined in the absence of a proper record, the rules of chapter 5 of title 14 of the California Code of Regulations would have afforded Quaker a fair opportunity to be heard and to place sufficient written material in the administrative record to provide an adequate basis upon which thereafter to seek administrative mandate respecting any taking asserted to have resulted from the Commission's ruling.[8]

Moreover, the present procedure for administrative mandate has not prevented landowners from proving conditions imposed by the Commission have been excessive or invalid. (E.g., *Nollan* v. *California Coastal Comm'n, supra,* 483 U.S. at p. 837 [97 L.Ed.2d at p. 689]; *Liberty* v. *California Coastal Com.* (1980) 113 Cal.App.3d 491, 504 [170 Cal.Rptr. 247].) Other litigants who have attacked permit conditions have not been unsuccessful because of any paucity of evidence before the trial court, but because a constitutionally sufficient nexus has been found to exist between the benefit conferred on the applicant and the burden imposed on the public. (E.g., *Paoli* v. *California Coastal Com.* (1986) 178 Cal.App.3d 544, 552-553 [223 Cal.Rptr. 792]; *Whaler's Village Club* v. *California Coastal Com.* (1985) 173

[8] For example, section 13064 of title 14 of the California Code of Regulations states a "public hearing on a permit matter shall be conducted in a manner deemed most suitable to ensure fundamental fairness to all parties concerned, and with a view toward securing all relevant information and material necessary to render a decision without unnecessary delay."

Section 13065 of title 14 of the California Code of Regulations provides in part: "Any relevant evidence shall be considered if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might make improper the admission of such evidence over objection in civil actions."

California Code of Regulations, title 14, section 13067 states, "[s]peakers' presentations shall be to the point and shall be as brief as possible; visual and other materials may be used as appropriate. The commission may establish reasonable time limits for presentation(s); . . ."

California Code of Regulations, section 13074 of title 14 provides in part: "[A]ny interested party may submit written evidence including rebuttal arguments, to the commission."

Cal.App.3d 240, 255-261 [220 Cal.Rptr. 2]; *Grupe* v. *California Coastal Com.* (1985) 166 Cal.App.3d 148, 171-177 [212 Cal.Rptr. 578]; *Remmenga* v. *California Coastal Com.* (1985) 163 Cal.App.3d 623, 627-630 [209 Cal.Rptr. 628].)

Further, an action for inverse condemnation is a two-step proceeding in which the trial court first sits as the trier of law and fact and determines whether the plaintiff has suffered a "taking." (*Lussier* v. *San Lorenzo Valley Water Dist.* (1988) 206 Cal.App.3d 92, 107 [253 Cal.Rptr. 470].) Because the landowner is not entitled to a jury on this issue in any event, the effect of any deficiency in the record is mollified.

In appropriate circumstances, the trial court has a mechanism available whereby the administrative record may be augmented. Section 1094.5, subdivision (e), allows the trial court to remand the matter to the administrative agency to reconsider the case in light of evidence "which, in the exercise of reasonable diligence, could not have been produced or which was improperly excluded at the hearing before respondent, . . . ; or, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, the court may admit the evidence at the hearing on the writ without remanding the case."

Based upon the present record, it can only be concluded that any asserted inability on the part of Quaker to present its constitutional claim adequately in the context of a section 1094.5 hearing is self-inflicted, and not properly before this court because Quaker never bothered to create the necessary record. We have no transcript of the hearing before the Commission and no trial court record from which we might have found Quaker's claims had merit.

While we recognize there are evidentiary limitations inherent in the mandamus procedure, there simply is no way of knowing, based upon the present record, whether a hearing conducted in accordance with chapter 5 of title 14 of the California Code of Regulations would, or would not, have allowed Quaker adequately to present its claims. Until the longstanding statutory scheme defined by section 30801 and section 1094.5 has been tested properly, we are reluctant to find it inadequate.

We therefore conclude Quaker has failed to show the present procedure of asserting the invalidity of permit conditions through a petition for writ of administrative mandate is not a fair forum.

Moreover, the well established procedures should be given a chance to work following *First English*. There has been no showing that a mandamus

proceeding joined with an action for inverse condemnation is not effective. To the contrary, that is precisely what occurred with respect to the Quaker parcel. Thus, the issue appellants seek to raise here properly will be presented in that case, or another in a similar procedural posture. In the interim, enactments by the Legislature to alleviate the asserted evidentiary shortcomings are appellants' only available relief.

Appellants and amici next urge *Ham* is not in step with other cases which have considered the application of *First English*. However, the cases relied upon speak in dicta and involve either a direct physical taking (*Sinaloa Lake Owners Ass'n* v. *City of Simi Valley* (9th Cir. 1989) 864 F.2d 1475 (hereafter *Sinaloa Lake*)), or an ordinance assertedly invalid on its face (*Mira Development Corp.* v. *City of San Diego* (1988) 205 Cal.App.3d 1201, 1220, fn. 11 [252 Cal.Rptr. 825]).

Appellants next argue that consideration of *First English* by Division 7 of this court on remand from the United States Supreme Court supports their view. They quote *First English Lutheran Church* v. *County of Los Angeles* (1989) 210 Cal.App.3d 1353, 1359 [258 Cal.Rptr. 893], as follows: "The Supreme Court held monetary damages indeed can be sought as an initial remedy for 'inverse condemnation' claims based on unconstitutional 'regulatory takings.'" However, even on remand *First English* does not address procedural requirements and, in any event, involves an ordinance, not an administrative ruling.[9]

██ ██ ██ Finally, appellants assert their allegations of denial of due process, as opposed to inverse condemnation claims, must be allowed to proceed.[10] They rely on *Sinaloa Lake* for this proposition. However, *Sinaloa Lake* discusses exhaustion of state compensation claims before institution of federal compensation claims, and is not in point. Regardless of whether Quaker pleads its cause of action as one for inverse condemnation or as a denial of due process, the essential underpinning of its recovery is the invalidity of the administrative action. That action must be reviewed by petition for writ of administrative mandate. Failure to do so renders the administrative action immune from collateral attack. (*Ham, supra,* 210 Cal.App.3d at p. 1496.)

██ We restate our conclusion *First English* did not obviate the rule that a landowner must petition for a writ of administrative mandate to

---

[9] A petition for review filed July 3, 1989, in *First English* is pending presently before the California Supreme Court (case No. S010941).

[10] A denial of substantive due process differs from an inverse condemnation claim in that it seeks to assert failure of the restriction reasonably to relate to a legitimate governmental purpose. (*Nollan, supra,* 483 U.S. at pp. 834-835, fn. 3 [97 L.Ed.2d at p. 688]; *Grupe* v. *California Coastal Com., supra,* 166 Cal.App.3d at pp. 168-169; see also, Nichols, The Law of Eminent Domain (3d ed. 1988) § 4.9, p. 4-52.)

contest conditions imposed by the Commission. Thus, in addition to our finding Quaker has waived its right to sue with respect to the Piuma property by complying with the conditions of the permit issued, Quaker also has failed to attack the conditions imposed by the Commission in a timely manner. On this additional ground, the trial court properly sustained respondents' demurrer without leave to amend.

■■■ 3. *The State and state agencies are not "persons" within the meaning of 42 United States Code section 1983.*

Appellants' complaint alleges the Commission "at all times relevant hereto acted as an agent, division and governmental arm of the defendant-respondent STATE OF CALIFORNIA."

"It is settled law that a state and its agencies are not 'persons' within the meaning of section 1983. (*Alabama* v. *Pugh* (1978) 438 U.S. 781, 782 [57 L.Ed.2d 1114, 1116, 98 S.Ct. 3057] [state and State Board of Corrections]; *Taylor* v. *Mitzel* (1978) 82 Cal.App.3d 665, 670 [147 Cal.Rptr. 323]." (*Mezey* v. *State of California* (1984) 161 Cal.App.3d 1060, 1065 [208 Cal.Rptr. 40]; *Pyne* v. *Meese* (1985) 172 Cal.App.3d 392, 405 [218 Cal.Rptr. 87]; *Bennett* v. *People of State of California* (9th Cir. 1969) 406 F.2d 36, 39.)

The distinction between local government units which are not part of the State and "States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes" was recently addressed in *Will* v. *Michigan* (1989) 491 U.S. __, __ [105 L.Ed.2d 45, 57, 109 S.Ct. 2304]. The high court concluded "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." (491 U.S. at p. __ [105 L.Ed.2d at p. 58].)

Nothing in *Lake County Estates* v. *Tahoe Planning Agcy.* (1978) 440 U.S. 391 [59 L.Ed.2d 401, 99 S.Ct. 1171], requires a different result. The Tahoe Planning Agency is a bi-state agency and not an arm of a state. Because it is a separate legal entity, it is not entitled to protection under the Eleventh Amendment. Similarly, a municipality is not immune from a federal civil rights suit. (*Monell* v. *New York City Dept. of Social Services* (1978) 436 U.S. 658, 663 [56 L.Ed.2d 611, 619, 98 S.Ct. 2018].)

Because the Commission is clearly a state agency, it is immune from prosecution under 42 United States Code section 1983.

The trial court properly dismissed the civil rights causes of action without leave to amend.

## CONCLUSION

The trial court properly ruled the coastal zone boundary is established by the maps referred to in the Coastal Act. Quaker cannot now attack the conditions imposed on the development of the Piuma property because it complied with them, and failed to exhaust its administrative remedies by filing an action for administrative mandamus before, or in conjunction with, its claim for inverse condemnation. The State and its agencies are not persons for the purpose of federal civil rights suits under 42 United States Code section 1983.

## DISPOSITION

The judgment is modified by sustaining without leave to amend respondents' demurrer to the ninth through twelfth causes of action on the ground Quaker has waived the right to attack the permit conditions by complying with them and, as so modified, the judgment is affirmed.

Respondents to recover costs on appeal.

Danielson, J., and Arabian, J., concurred.

The petition of appellants Rossco Holdings Incorporated for review by the Supreme Court was denied November 2, 1989.