[No. B074129. Second Dist., Div. One. Feb. 22, 1994.]

KENNETH E. HEALING, Plaintiff and Appellant, v.
CALIFORNIA COASTAL COMMISSION, Defendant and Respondent.

**COUNSEL**

Zumbrun, Best & Findley, Ronald A. Zumbrun, Sharon L. Browne, James S. Burling, Orrin F. Finch and Victor J. Wolski for Plaintiff and Appellant.

Richard F. Hamlin for Amicus Curiae on behalf of Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Jan S. Stevens, Assistant Attorney General, and Peter H. Kaufman, Deputy Attorney General, for Defendant and Respondent.

**OPINION**

**VOGEL (Miriam A.), J.**—In 1977, Kenneth E. Healing purchased a 2.5-acre lot in the Santa Monica Mountains, overlooking Tuna Canyon and the Pacific Ocean. What he had in mind was building a modest, three-bedroom home for his family. What he got was a long-term nightmare.

### FACTS

Healing's property (located at 2640 South Chard Avenue, in the County of Los Angeles) is within the inland boundaries of the coastal zone and is regulated by the California Coastal Act of 1976, section 30000 et seq. of the Public Resources Code.[1] Although some parts of Tuna Canyon are undeveloped, the same cannot be said of the area around Healing's lot. There are at least three existing homes within 100 to 380 feet of Healing's property and a paved street (Everdin Lane) intersects South Chard within 800 feet of

---

[1] Unless otherwise stated, all section references are to the Public Resources Code. The Coastal Act is designed to protect, maintain and, where feasible, enhance and restore the overall quality of the coastal zone environment (§ 30001.5, subd. (a)), while at the same time recognizing that future developments, carefully planned and developed, are essential to the economic and social well-being of the people of California and especially to working persons employed within the coastal zone (§ 30001, subd. (d)). The "coastal zone" is the area defined by section 30103.

Healing's lot. Tuna Canyon Road, a main thoroughfare, intersects Everdin within one-quarter mile of Healing's property. Water lines and electric and telephone services are available at the intersection of Chard and Everdin.[2]

### A.

Anyone who wants to build on his own coastal zone property must obtain a coastal development permit. (§ 30600, subd. (a).) The application for a coastal development permit must be submitted either to the Coastal Commission or to the local governmental agency (in this case, the County of Los Angeles), depending upon which entity has permitting jurisdiction—which, in turn, depends upon whether the local governmental agency has obtained the Coastal Commission's certification of a Local Coastal Program (LCP).[3] If a local governmental agency has obtained certification of its LCP, the local agency becomes the permitting authority. (§ 30600, subd. (d).) If certification has not been obtained, the Coastal Commission is the permitting authority (unless the local government establishes procedures for handling permits, which the County of Los Angeles has not done). (§ 30600, subds. (b), (c), (d).)

In 1982, the County of Los Angeles submitted an LCP for the Santa Monica Mountains, which was rejected as inadequate, after which a revised version was submitted. On December 16, 1986, the Coastal Commission certified the LUP segment of the LCP and findings in support of that certification were adopted on January 15, 1987. But the County never submitted the required zoning ordinance and maps (§ 30108.6), and the LCP itself was therefore never certified. As a result, permit jurisdiction was not transferred to the County and remained with the Coastal Commission.

Where, as here, the Commission retains permitting jurisdiction, the Commission is required to issue a coastal development permit if it finds the proposed development will not prejudice the ability of the County to prepare an LCP in conformity with the Coastal Act. If a development permit is denied on the ground its issuance would prejudice the local government's

[2]Immediately above and adjacent to Tuna Canyon is the Tuna Canyon Watershed, one of two undeveloped drainage areas in the eastern Santa Monica Mountains. The watershed, portions of which are designated as an Environmentally Sensitive Habitat Area (ESHA), has a stream, a riparian woodland, a wildlife population and a habitat for migratory birds. (§ 30107.5.) In 1973, Tuna Canyon was ranked fourth on a state "preservation priority list" and in 1976 it was designated by the County as one of 62 "Significant Ecological Areas." Although Healing's property is within the Tuna Canyon Watershed and adjacent to the ESHA, it is not within the ESHA.

[3]Among other things, the LCP includes the local government's Land Use Plan (LUP), zoning ordinances, and zoning district maps. (§ 30108.6; see also § 30510 et seq.) The LUP segment of the LCP indicates the kinds, location and intensity of land uses, the applicable resource protection and development policies and, where necessary, a listing of implementing actions. (§ 30108.5.)

ability to prepare a certifiable LCP, the denial must be accompanied by a specific finding which sets forth the basis for that conclusion. (§ 30604, subd. (a).)

B.

In 1977, Healing bought his lot for $40,000, planning to build a new home for his family.[4] In 1979, Healing employed an architect to prepare drawings for his house and started making inquiries about permit requirements, at which time he was told the Coastal Commission would not consider an application to build a house on his lot because the property was then within an area designated as an ESHA. He was also told there might be some changes and he decided to put his building plans on hold.

In 1987, Healing learned that, as a result of the Commission's certification of the LUP, his lot was no longer within an ESHA but instead had been placed in the "Significant Watershed Area" category, which permits home construction on a legal-size, properly zoned lot, provided the property is located near existing roadways and built to avoid environmental damage. Healing employed a consultant and applied for the necessary permits, obtaining approval "in concept" from the County on September 30, 1987.

On October 14, Healing submitted a coastal development permit application to the Commission, requesting permission to build a one-story, 2,650-square-foot house. Since the County's LCP had been submitted to the Commission but had not been certified, the Commission reviewed Healing's application to determine whether his proposed development would prejudice the County's ability to obtain certification. (§ 30604, subd. (a).) During this review, the Commission realized that, under the LUP segment of the County's LCP, development within a Significant Watershed Area had to be reviewed by an Environmental Review Board (ERB), a body comprised of qualified professionals with technical expertise in resource management and mandated to determine the "individual and cumulative impacts of projects and to make a recommendation to the County Regional Planning Commission as to conformity with the requirements of the LCP." There was only one problem—the County had never created an ERB.

Under the LUP, the County was also supposed to develop a "lot retirement program" to deal with lots the Commission determined could not be developed. The lot retirement program "involves acquisition, offer of tax delinquent lots to adjacent owners, lot consolidation, cluster and redevelopment

---

[4]The record does not disclose what, if any, building restrictions existed in 1977 (at which time the Coastal Act was only one year old). Although the lot apparently was then included within an ESHA, we don't know what the effect of that classification was at that time. The most we know is that Healing was told, in 1979, that the Commission was not, in 1979, approving any new construction in ESHA's.

techniques [and] lot exchanges." Like the ERB, however, the lot retirement program was never created.

From the Coastal Commission's perspective, the fact that the ERB did not exist meant the Commission was unable to say whether approval of Healing's permit application would prejudice the County's LCP. According to the Commission, the ERB had to determine whether Healing's house would have a significant cumulative adverse effect on the Tuna Canyon ESHA's and Significant Watershed Areas. If the nonexistent ERB found an adverse effect, the LUP required that Healing's lot be "retired" via one of six methods described in the nonexistent lot retirement program. "Given that fact," the Commission told the trial court, it "could not approve a project for which the ERB might recommend denial without prejudicing the County's LCP effort." For this reason, the Commission's staff recommended denial of Healing's application and on July 12, 1989, the Commission denied the application.

## C.

Healing sued and on April 26, 1990, he filed his first amended petition for a writ of administrative mandate and complaint for inverse condemnation. The Coastal Commission answered and in 1991 Healing filed a motion for an order (1) severing the "takings liability issue from the compensation phase of the condemnation cause of action" and (2) setting the takings liability issue for trial at the same time as the hearing on his petition for administrative mandate. The Coastal Commission agreed with Healing that the compensation issues had to be severed but contended the takings issues were to be determined on the administrative record, not at a "trial" in which evidence outside the administrative record might be considered. Eventually, the petition for a writ of mandate was set for hearing.

On September 26 (before Healing's petition was heard), in another, unrelated case (Sierra Club v. County of Los Angeles (Super. Ct. L.A. County, 1990, No. C752027)), the County was ordered to establish the ERB required by the LUP and "not to approve development proposals" in Healing's area "without first getting advice and recommendations from the Environmental Review Board."

On November 15, the trial court (Hon. Ronald M. Sohigian) found the Coastal Commission's findings were inadequate (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 514 [113 Cal.Rptr. 836, 522 P.2d 12]) and ordered the Commission to prepare complete findings and file a return within 180 days. In its order, the trial court expressly permitted the Coastal Commission to request advice and recommendations from the ERB (which the trial court apparently believed had

been or shortly would be created) and, at least implicitly, suggested the Commission ought to do so before adopting its revised findings.

Additional findings were made and submitted to the trial court by way of a return, after which Healing attempted to file a supplemental petition. For reasons which are not clear, the trial court (Hon. Robert H. O'Brien) refused to permit the supplemental pleading and on May 11, 1992, Healing filed a new petition for a writ of administrative mandate and complaint for inverse condemnation.[5] In this pleading, Healing added allegations that, as a result of the order requiring the County to establish the ERB, the County had done so—but that, instead of referring Healing's application to the ERB, the Coastal Commission had simply adopted revised findings to justify its original denial.

The Commission answered the new petition and a hearing was set for December 10, 1992. In addition to his arguments that a permit should have been granted, Healing filed separate motions (1) urging judicial review of the administrative proceedings by way of an independent judgment standard and (2) requesting summary adjudication of issues on the taking phase of his inverse condemnation claim.

At the hearing, the trial court denied Healing's motion for summary adjudication, held the takings issues were to be resolved in the administrative mandate action, found the petition was "ripe for review," denied Healing's motion to apply an independent judgment standard of review, denied the petition, and found there was no unconstitutional taking. Healing appeals from the judgment thereafter entered.

## DISCUSSION

### I.

*The Petition for Writ of Administrative Mandate*

Healing contends the trial court should not have denied his petition for a writ of administrative mandate. More specifically, he contends the trial court should not have accepted the Coastal Commission's conclusory finding that it was unable to determine whether approval of Healing's application would prejudice the County's ability to prepare its LCP. We agree, and therefore do not reach Healing's other arguments addressing the mandate cause of action.

### A.

The Commission's revised findings in support of its denial of Healing's permit all turn on its threshold finding that the County could be prejudiced in the preparation of its LCP if Healing is allowed to build his house:

---

[5]The two petitions were deemed related actions and the administrative record filed with the first petition was "judicially noticed" for the second petition. We treat the two petitions as a single case.

"Before the Commission can approve a project, it must find the project . . . will not prejudice the ability of a local government to prepare a certifiable LCP . . . .

"When the Commission certified the [County's] LUP, it was envisioned that projects in significant Watersheds like the Tuna Canyon Watershed would be reviewed by the County Environmental Review Board. This panel of experts would provide an independent technical analysis of the impacts which could be expected of development proposals for this area and ways in which such impacts could be mitigated. These recommendations could be utilized by the County in designing individual and group solutions to the development proposals for the area. . . .

"To this date, the County has not established the ERB . . . . The County has been ordered by the Los Angeles County Superior Court to establish an ERB. However, there is no indication from [Healing] when or whether he will submit his project to review by the ERB."

B.

Findings are required to apprise the court of the basis of the Commission's decision to deny a permit. To accomplish that goal, the findings must support the decision and the evidence must support the findings. (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d at p. 514.) Here, the findings are inadequate because they are not supported by any evidence.

First, there is no evidence in the record to support the Commission's finding that the ERB has not yet been created. To the contrary, the evidence is that the County was ordered to create the ERB and we have no reason to assume the County would fail to comply with a valid court order. (Evid. Code, § 664; *City of Sacramento* v. *State Water Resources Control Bd.* (1992) 2 Cal.App.4th 960, 976 [3 Cal.Rptr.2d 643] [courts must presume that an agency carries out its official obligations].) A conclusory statement in findings, unsupported by any evidence in the record suggesting the ERB was *not* created, is per se insufficient. (*Kateen* v. *Department of Real Estate* (1985) 169 Cal.App.3d 481, 485 [215 Cal.Rptr. 295]; *City of Rancho Palos Verdes* v. *City Council* (1976) 59 Cal.App.3d 869, 876, 882-890 [129 Cal.Rptr. 173].) As a practical matter, we simply don't know whether the ERB has been created.

Second, the Commission offers no clue at all to explain its position that, now or when the ERB is created, it has somehow become Healing's obligation to solicit and obtain the ERB's involvement. In our view, that is the Commission's obligation, not Healing's. The County's failure to resolve its disputes with the Commission about the sufficiency of the County's proposed LCP makes the Commission, not the County, the permitting authority

with jurisdiction to rule on Healing's application. (§ 30600, subds. (b), (c), (d).) Accordingly, Healing's application was made to the proper entity and it is the Commission's obligation, not Healing's, to refer Healing's application to the ERB.

Third, as the Commission concedes on this appeal, the most the evidence shows is that Healing's project *could* (not that it would) be prejudicial to the County's completion of a certifiable LCP—because the LUP segment of the LCP permits several possible outcomes for projects such as Healing's, "none of which the Commission could know the County would choose at the time the Commission was rendering its decision because the County had not yet established the ERB or any of the programs necessary to effectuate an ERB recommendation for mitigation or alternative development patterns." Of course, this argument conveniently ignores the fact that the trial court expressly permitted and implicitly recommended that, before rendering its revised findings, the Commission refer the matter to the ERB and take additional evidence. Aside from that little detail, the Commission's conclusion is an admission that it is unable to say Healing's project *would* be prejudicial and that it may *never* be able to say one way or the other.

And therein lies the rub. The County has been trying since 1982 to obtain certification of its LCP, without success. Meanwhile, along comes poor Healing who, as directed by the Coastal Act, applies to the Coastal Commission for a permit to build his house, only to be told by the Commission that, because the Commission has not approved the County's LCP, the Commission can't say one way or the other whether Healing's house "could" affect the County's ability to obtain that certification and, as far as the Commission is concerned, its failure to act one way or the other means there has been no denial of a permit which, in turn, means Healing's complaints are not "ripe" for judicial review—and may never be so.

It is in the nature of our work that we see many virtuoso performances in the theatres of bureaucracy but we confess a sort of perverse admiration for the Commission's role in this case. It has soared beyond both the ridiculous and the sublime and presented a scenario sufficiently extraordinary to relieve us of any obligation to explain why we are reversing the judgment on Healing's mandate petition. To state the Coastal Commission's position is to demonstrate its absurdity.

Healing's petition for a writ of mandate should have been granted, with directions to the Commission to refer Healing's permit application to the ERB for the ERB's prompt review and recommendations or, if there is still no ERB in existence, to disregard the County's proposed LCP on the ground the County has abandoned any intent it might once have had to become a permitting authority.

## II.

### *The Complaint for Inverse Condemnation*

Healing contends his suit for inverse condemnation has to be tried, first to the court to determine whether there is liability for a taking and then, if there is liability, to a jury to determine the amount of compensation owed to Healing. The Commission contends the takings issues are properly decided as part of Healing's petition for administrative mandate, on the basis of the administrative record, subject to the limited augmentation allowed by subdivision (e) of section 1094.5 of the Code of Civil Procedure. The trial court agreed with the Commission. We agree with Healing.[6]

### A.

Eminent domain is the right of government to take private property for public use upon the payment of "just compensation." (*Metropolitan Water Dist.* v. *Adams* (1940) 16 Cal.2d 676, 679-680 [107 P.2d 618]; *Chicago, B. & Q.R. Co.* v. *Chicago* (1897) 166 U.S. 226, 241 [41 L.Ed. 979, 986, 17 S.Ct. 581].) Although the traditional method of exercising the power of eminent domain is to acquire title and possession of property by a suit for condemnation (8 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 931, p. 481), there are other kinds of takings, including those described as "regulatory takings"—which is what happens when a governmental agency, in the exercise of its police power, adopts or enforces a regulation that goes too far (*Pennsylvania Coal Co.* v. *Mahon* (1922) 260 U.S. 393, 415 [67 L.Ed. 322, 325-326, 43 S.Ct. 158, 28 A.L.R. 1321]), either by failing to substantially advance legitimate state interests or by denying the owner all economically beneficial or productive use of his land (*Lucas* v. *So. Carolina Coastal Council* (1992) 505 U.S. ___, ___ [120 L.Ed.2d 798, 813, 112 S.Ct. 2886].)

Redress for a regulatory taking is obtained by a property owner's action for inverse condemnation, to recover damages for the injury to or loss of his property resulting from a governmental agency's conduct pursued in furtherance of public objectives. (*Golden Cheese Co.* v. *Voss* (1991) 230 Cal.App.3d 727, 731 [281 Cal.Rptr. 602]; *Yee* v. *City of Sausalito* (1983) 141 Cal.App.3d 917, 920 [190 Cal.Rptr. 595].) Healing's claim, asserted in his complaint for inverse condemnation, is that the Coastal Commission's denial of his permit application is a regulatory taking.

---

[6]If the Commission ultimately grants Healing's application for a development permit, his inverse condemnation claim would not necessarily be moot. (See *First Lutheran Church* v. *Los Angeles County* (1987) 482 U.S. 304 [96 L.Ed.2d 250, 107 S.Ct. 2378].) Although we express no view on whether Healing would prevail on a temporary taking claim, the fact that he has the right to pursue it means our reversal of the judgment denying his petition for a writ of mandate does not make the inverse condemnation issues moot.

## B.

The question whether any part of an inverse condemnation action can be decided by means of a petition for administrative mandate, previously considered in passing but never actually determined, is squarely presented by this case as an issue of first impression. For the reasons explained below, we hold that review by way of administrative mandate is not an adequate substitute for a court trial of the takings issues raised by an inverse condemnation claim based on the Coastal Commission's denial of a development permit.

### 1.

An inverse condemnation trial is comprised of two parts. The first phase involves a court trial of mixed questions of law and fact to determine whether the governmental entity is liable for a taking. If the court concludes there is liability, the case moves into a second phase, during which compensation is fixed by a jury. (*People* v. *Ricciardi* (1943) 23 Cal.2d 390, 402 [144 P.2d 799]; *Marshall* v. *Department of Water & Power* (1990) 219 Cal.App.3d 1124, 1141 [268 Cal. Rptr 559].) All we are concerned with in this case is the first stage because everyone, including the Commission, agrees that a finding of liability on the takings issues absolutely entitles the landowner to a jury trial on the compensation issues.

The question, then, is whether a trial court can determine taking liability based upon an administrative record created under circumstances where, as the Commission concedes, witnesses are not sworn, testimony is not presented by means of direct or cross-examination but rather by narrative statements, and the Commission does not have the authority to issue subpoenas or compel anyone to attend its hearing. (See *United States* v. *Utah Constr. Co.* (1966) 384 U.S. 394, 422 [16 L.Ed.2d 642, 660-661, 86 S.Ct. 1545] [an administrative agency's factual determinations have collateral estoppel effect only if the agency was acting in a judicial capacity]; *Allen* v. *McCurry* (1980) 449 U.S. 90, 95 [66 L.Ed.2d 308, 313-314, 101 S.Ct. 411] [an administrative agency's factual determinations satisfy basic concepts of due process only if the party aggrieved had a full and fair opportunity to litigate his claim].)

Our review of the cases relied on by the Commission does not support the Commission's position that an administrative mandate hearing is a satisfactory substitute for a trial.

### 2.

In *Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266, 269-270 [157 Cal.Rptr. 372, 598 P.2d 25] (affd. on other grounds in *Agins* v. *Tiburon* (1980) 447

U.S. 255 [65 L.Ed.2d 106, 100 S.Ct. 2138]), our Supreme Court held that a landowner cannot maintain an inverse condemnation suit when a public agency adopts a zoning ordinance which substantially limits (but does not totally destroy) the use of his property. Although the landowner could challenge both the constitutionality of the ordinance and the manner in which it was applied to his property by attacking its validity in an action for declaratory relief or by a petition for a writ of mandate, he could not seek damages on an inverse condemnation theory unless, after the ordinance was declared invalid, the government nevertheless continued to enforce it.

In *First Lutheran Church* v. *Los Angeles County, supra,* 482 U.S. at pages 306-307 [96 L.Ed.2d at pp. 258-259], the Supreme Court rejected the California Court of Appeal's holding that, based on *Agins*, ". . . a landowner who claims that his property has been 'taken' by a land-use regulation may not recover damages for the time before it is finally determined that the regulation constitutes a 'taking' of his property." To the contrary, the Supreme Court concluded that where the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective. (*Id.* at p. 321 [96 L.Ed.2d at pp. 267-268].)[7] It follows that the Commission may be liable for a regulatory taking even if it ultimately issues a permit to Healing.

3.

The Commission contends the legitimacy of the regulation which forms the basis of a regulatory taking defeats the landowner's claim to just compensation. The United States Supreme Court's recent decision in *Lucas* v. *So. Carolina Coastal Council, supra,* 505 U.S. __ [120 L.Ed.2d 798], resolves this issue against the Commission.

In 1986, David Lucas paid $975,000 for two beachfront lots in South Carolina, intending to build a single-family home on each lot. In 1988, the South Carolina Legislature adopted regulations which barred Lucas from building any permanent habitable structures on either of his parcels. Lucas filed suit in state court, conceding the validity of the legislation as a lawful exercise of the state's police power but nevertheless contending its complete extinguishment of his property's value entitled him to compensation. Although the trial court agreed with Lucas, the South Carolina Supreme Court

---

[7]In *First Lutheran*, the Supreme Court was addressing an ordinance which denied the landowner all use of its property, and it did not "deal with the quite different questions that would arise in the case of normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like . . . ." (*First Lutheran Church* v. *Los Angeles County, supra,* 482 U.S. at p. 321 [96 L.Ed.2d at pp. 267-268].) We summarily reject the Coastal Commission's contention that the delay Healing has suffered (and is continuing to suffer) is "normal."

did not, and the United States Supreme Court granted certiorari. (*Lucas* v. *So. Carolina Coastal Council, supra*, 505 U.S. at p. __ [120 L.Ed.2d at p. 807].)

In *Lucas*, the Supreme Court started with the premise that the Fifth Amendment is violated when land use regulation " 'does not substantially advance legitimate state interests *or denies an owner economically viable use of his land.*' " (*Lucas* v. *So. Carolina Coastal Council, supra*, 505 U.S. __ [120 L.Ed.2d at p. 813].) Accordingly, ". . . when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." (*Id.* at p. __ [120 L.Ed.2d at p. 815].) The court then explained the next step in the inquiry:

"Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with. This accords, we think, with our 'takings' jurisprudence, which has traditionally been guided by the understandings of our citizens regarding the content of, and the State's power over, the 'bundle of rights' that they acquire when they obtain title to property. It seems to us that the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers; '[a]s long recognized, some values are enjoyed under an implied limitation and must yield to the police power.' . . . And in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, he ought to be aware of the possibility that new regulation might even render his property economically worthless (at least if the property's only economically productive use is sale or manufacture for sale) . . . . In the case of land, however, we think the notion pressed by [South Carolina] that title is somehow held subject to the 'implied limitation' that the State may subsequently eliminate all economically valuable use is inconsistent with the historical compact recorded in the Takings Clause that has become part of our constitutional culture." (*Lucas* v. *So. Carolina Coastal Council, supra*, 505 U.S. at p. __ [120 L.Ed.2d at p. 820]; fns. and citations omitted.)

The court continued: "The 'total taking' inquiry we require today will ordinarily entail (as the application of state nuisance law ordinarily entails) analysis of, among other things, the degree of harm to public lands and resources, or adjacent private property, posed by the claimant's proposed activities, . . . the social value of the claimant's activities and their suitability to the locality in question, . . . and the relative ease with which the

alleged harm can be avoided through measures taken by the claimant and the government (or adjacent private landowners) alike . . . . The fact that a particular use has long been engaged in by similarly situated owners ordinarily imports a lack of any common-law prohibition (though changed circumstances or new knowledge may make what was previously permissible no longer so[)] . . . . So also does the fact that other landowners, similarly situated, are permitted to continue the use denied to the claimant.

"It seems unlikely that common-law principles would have prevented the erection of any habitable or productive improvements on [Lucas's] land; they rarely support prohibition of the 'essential use' of land . . . . The question, however, is one of state law to be dealt with on remand. We emphasize that to win its case South Carolina must do more than proffer the legislature's declaration that the uses Lucas desires are inconsistent with the public interest, or the conclusory assertion that they violate a common-law maxim such as sic utere tuo ut alienum non laedas [use your own property in such a manner as not to injure that of another]. As we have said, a 'State, by ipse dixit, may not transform private property into public property without compensation . . . .' . . . Instead, as it would be required to do if it sought to restrain Lucas in a common-law action for public nuisance, South Carolina must identify background principles of nuisance and property law that prohibit the uses he now intends in the circumstances in which the property is presently found. Only on this showing can the State fairly claim that, in proscribing all such beneficial uses, the [regulation] is taking nothing." (*Lucas v. So. Carolina Coastal Council, supra,* 505 U.S. at pp. ___, ___ [120 L.Ed.2d at pp. 822-823]; fns. and citations omitted.)

Applied to the case before us, the rules announced in *Lucas* demonstrate (1) the fallacy of the Commission's suggestion that there can be no inverse condemnation when it enforces a valid regulation and (2) the inadequacy of administrative review to determine the takings issues.

Assuming Healing would concede the validity of the Coastal Act, he would nevertheless be entitled to pursue his inverse condemnation claim and to an opportunity to inquire into the degree of harm to public lands and resources or adjacent private property posed by his proposed three-bedroom house; the social value of his activities and their suitability to the locality in question; the relative ease with which the alleged harm can be avoided through measures taken by Healing and the Coastal Commission; the fact that a similar use has long been engaged in by at least three similarly situated owners of adjacent lots; and the nature of the estate acquired by Healing in 1977, including the restrictions then imposed on his property, to permit a determination of the nature of his estate and a finding as to whether the use he now proposes was permissible at the time he acquired title.

The Commission, of course, would have an opportunity to show that changed circumstances or new knowledge may make what was previously permissible no longer so, and the parties could then present evidence about whether other landowners, similarly situated, are permitted to continue the use denied to Healing. To win its case on the taking issue (as opposed to what it takes to prove that it properly denies a permit in the first instance), the Coastal Commission would have to do more than proffer the Legislature's declaration that the use Healing desires is inconsistent with the public interest, or the conclusory assertion that Healing's proposed use might somehow injure the land of another. The Commission, just because it says so, cannot transform private property into public property without compensation. To the contrary, the Commission can defeat Healing's takings claim only if it is able to show that, by its refusal to issue a permit, it is taking nothing from Healing. (*Lucas* v. *So. Carolina Coastal Council, supra*, 505 U.S. at pp. __, __ [120 L.Ed.2d at pp. 822-823].)

■ These are questions for a court of law to decide at an evidentiary trial, not by mandamus review of an administrative record of proceedings where the parties' right to present evidence was limited by the very nature of the administrative process. That this is so is demonstrated by *McDougal* v. *County of Imperial* (9th Cir. 1991) 942 F.2d 668, which had earlier reached essentially the same result as *Lucas*. In *McDougal*, the district court concluded that a governmental agency may deprive a landowner of all uses of his property without compensation if the agency is advancing a legitimate state interest. The Ninth Circuit disagreed, rejecting the notion that ". . . any legitimate purpose automatically trumps the deprivation of all economically viable use, such that whenever a regulation has a health or safety purpose, no compensation is ever required even if the land owner is thereby denied all use of his property. . . . [W]e believe that a court is required to consider the nature as well as the legitimacy of the state's interest together with the nature and extent of its impact on the owner's use of his land." (*Id.* at p. 676.)

■ To resolve this issue, evidence must be considered. "The legitimacy of the public interest involved, how much it is furthered by the regulatory actions at issue, the extent of the public benefit obtained or expected, and the degree that the [owner's] property rights and reasonable investment-backed expectations have been impaired are all factors which lie at the heart of the takings inquiry. These things typically cannot be assessed properly without a factual record." (*McDougal* v. *County of Imperial, supra*, 942 F.2d at p. 680.)

Accordingly, the mere fact that the regulation at issue has a legitimate public purpose is not a sufficient reason to deny compensation to the property owner whose land is rendered useless by the regulation. Instead, the

agency's obligation to pay just compensation is to be determined by a balancing of the competing interests articulated in *Lucas* and *McDougal*, a process which necessarily requires a trial. As a practical matter, there is no way a landowner can make the appropriate record at the administrative proceedings at which his permit application is denied. First, we refuse to assume the Coastal Commission would permit an extension of its hearings sufficient to accommodate the presentation of evidence supporting the land-owner's claims, particularly those going to the scope of his title and the extent of his reasonable investment-backed expectations. Second, where the landowner's claim is that the regulation, as applied to him (as opposed to facially), constitutes a taking, there is no "taking" issue until after the hearings are concluded and the Commission reaches its decision and completes its formal findings. (*Hoehne* v. *County of San Benito* (9th Cir. 1989) 870 F.2d 529, 534.) For these reasons, administrative mandate is not a substitute for a trial on the takings issues.

4.

The California cases are not inconsistent with these conclusions.

a.

In *California Coastal Com.* v. *Superior Court* (1989) 210 Cal.App.3d 1488 [258 Cal.Rptr. 567], a landowner (A. W. Ham, Jr.) applied to the Coastal Commission for permission to rebuild his beachfront residence. In 1985, the Commission approved the request—on condition that Ham dedicate an easement for public access. Ham complied with the condition, the Commission issued the permit, and Ham built his house. A couple of years later, the Supreme Court held that imposition of a similar condition on similar beachfront property constituted a taking requiring compensation. (*Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141].) But there was one major difference between Mr. Ham's case and Mr. Nollan's case—Nollan had not accepted the condition, but instead had filed a petition for a writ of mandate and a takings claim. (*Id.* at pp. 829-830 [97 L.Ed.2d at pp. 684-685].) Ham, as noted, had accepted the condition and built his house, and it was not until 1988, after the decision issued in Nollan's case, that Ham filed suit for inverse condemnation.

On these facts, the Court of Appeal followed the oft-repeated rule that a party's failure to seek judicial review of an administrative agency determination precludes the party from later challenging the merits of that determination in a collateral proceeding. (*California Coastal Com.* v. *Superior Court, supra,* 210 Cal.App.3d at p. 1493.) The rule is simple—a landowner who claims that a permit condition imposed by the Coastal Commission constitutes a taking must first establish the invalidity of the condition by way of a

timely petition for a writ of administrative mandamus. If he fails to do so, he has waived his inverse condemnation claim, a point conceded in our case. (*Id.* at p. 1496.) But we find nothing in that rule (or anywhere else in the opinion) to support the Coastal Commission's contention that an inverse condemnation claim, when properly preceded by or joined with a petition for a writ of mandate, is to be determined as part of the mandate petition, on the basis of the administrative record, without a trial on the merits of the takings issues.

### b.

In *Rossco Holdings Inc.* v. *State of California* (1989) 212 Cal.App.3d 642 [260 Cal.Rptr. 736], the Coastal Commission imposed several conditions on the development of three parcels of property. Rossco sued the Commission, alleging its properties were wrongfully included within the coastal zone and that the conditions were in any event improper and excessive. Rossco had not, however, filed a petition for a writ of administrative mandate to attack the Commission's conditions and it argued that it was not obligated to do so because its Fifth Amendment rights could not be restricted or restrained by a state rule. The Court of Appeal disagreed, concluding that a state's inability to insulate itself from the payment of damages for a temporary taking did not excuse a landowner from its obligation to comply with the procedural steps required to contest the action of the administrative agency. (*Id.* at p. 656.)

*Rossco* mentioned, but did not decide, that an administrative hearing *might*, "[i]n appropriate circumstances," provide an adequate record for review of a landowner's takings claims. (*Rossco Holdings Inc.* v. *State of California, supra,* 212 Cal.App.3d at p. 659.) In *Rossco,* however, *no petition for administrative mandate had been filed and no administrative record was before the court.* For these reasons, and because there had been an insufficient time to test the sufficiency of mandate proceedings since *First Lutheran* and *Nollan* were decided, the court held only that the landowner had failed to show the administrative procedure attacking the validity of the permit conditions was not a fair forum for the inverse condemnation claims. (*Rossco Holdings Inc.* v. *State of California, supra,* 212 Cal.App.3d at p. 659; see also *Patrick Media Group, Inc.* v. *California Coastal Com.* (1992) 9 Cal.App.4th 592, 611 [11 Cal.Rptr.2d 824] [important policy concerns underlie the requirement that inverse condemnation claims arising out of administrative actions, as well as other challenges to administrative actions, be raised *initially* by way of administrative mandamus].)[8]

---

[8]In *Patrick Media Group, Inc.* v. *California Coastal Com., supra,* 9 Cal.App.4th 592, as in *Rossco Holdings Inc.* v. *State of California, supra,* 212 Cal.App.3d at page 659, the claimant *did not file a petition for a writ of mandate and there was no administrative record* before the

 In the seven years since *First Lutheran* and *Nollan* were decided (and the five years since *Rossco* was decided), it has become clear that administrative proceedings are not the proper forum for consideration of the takings issues relevant to an inverse condemnation claim and that, therefore, a petition for writ of administrative mandate does not provide a satisfactory substitute for an evidentiary trial of those issues. For one thing, as *Lucas* and *McDougal* now require, one of the issues to be decided in the takings liability phase of an inverse condemnation action based upon a regulatory taking is whether the facially legitimate purpose of the regulation insulates the state from takings exposure. As discussed above, many of the facts ancillary to that determination are not relevant to the hearings on a permit application and, as in this case, are nowhere to be found in the administrative record. For another, as the court explained in *Hoehne* v. *County of San Benito, supra,* 870 F.2d at p. 534, where the landowner's claim is that the regulation, as applied to him, constitutes a taking, there is no "taking" issue until after the hearings are concluded and the Commission reaches its decision and completes its formal findings. Time has shown, we think, that although a landowner may be required to exhaust his administrative remedies by giving the Commission an opportunity to take the appropriate action, and to pursue a petition for a writ of mandate to afford the court an opportunity to declare a condition or a permit denial invalid, neither of those procedures provides a satisfactory substitute for an evidentiary trial on the takings issues.

As is made painfully apparent by the facts of this case—where the Commission denied Healing's application because it concluded it could not say what the effect of Healing's house will be on the County's ability to obtain certification of its LCP if the County ever decides to pursue certification—additional evidence is necessary to show what the County has or hasn't done; whether it or the Commission is at fault for the delay in certification of the LCP; whether the County has complied with the order to form the ERB and, if not, why not; what the Commission's motivation is for delay or speed or approval; and all of the facts going to the scope of

---

trial court or the Court of Appeal. Accordingly, we treat as dicta the comment in *Patrick Media Group, Inc.* v. *California Coastal Com., supra,* 9 Cal.App.4th at page 614, that where "an action for inverse condemnation is joined with a petition for administrative mandamus, the trial court initially determines in the mandamus action whether the administrative agency must pay compensation for property rights impinged upon by its action or rescind the action." Indeed, in the very next sentence, the court acknowledges that a claimant who initially files only a mandamus action has five years from the effective time of the taking to file an inverse condemnation action (*ibid.*), in which event one would not expect the takings issue to be determined other than at a trial.

Healing's title and expectations, all of which are relevant to the determinations the trial court must make in finding whether there has been a compensable taking.[9]

## 5.

There is one more reason why the constitutional takings issues cannot be determined by a petition for a writ of administrative mandate. Although under appropriate circumstances a court may remand a matter to the administrative agency to consider additional evidence (Code Civ. Proc., § 1094.5, subd. (e)), the Coastal Commission is not legislatively authorized to consider much of the evidence and many of the issues relevant to an inverse condemnation action. To the contrary, the Commission's powers and duties are only those vested in it by the Coastal Act. Thus, for example, the Commission has the power to adopt rules and regulations (§ 30333), to apply for and accept grants, appropriations and contributions (§ 30334.5), to provide planning and regulatory assistance to local governments (§ 30336), to manage its own funds (§ 30340), and so on. In short, the Commission is authorized to make and enforce rules and decide whether to grant permits. It is not an adjudicatory body authorized to decide issues of constitutional magnitude. (Cf. § 30010; *El Camino Community College Dist.* v. *Superior Court* (1985) 173 Cal.App.3d 606, 612 [219 Cal.Rptr. 236] [an administrative agency created by statute is vested only with the powers expressly conferred by the Legislature and cannot exceed the powers granted to it].)

## C.

For the foregoing reasons, we conclude that the takings issues raised by an inverse condemnation action alleging a regulatory taking arising from the Coastal Commission's denial of a development permit are to be determined in a court trial. If the administrative mandate petition is heard first, the doctrine of collateral estoppel may bar relitigation of some of the facts in the

---

[9]The Commission's reliance on *City of Santee* v. *Superior Court* (1991) 228 Cal.App.3d 713 [279 Cal.Rptr. 22], and *Tensor Group* v. *City of Glendale* (1993) 14 Cal.App.4th 154 [17 Cal.Rptr.2d 639], is misplaced. The former involves an action alleging fraud, breach of a mandatory duty and civil conspiracy where the remedies sought were declaratory and injunctive relief, not inverse condemnation damages. (*City of Santee* v. *Superior Court, supra,* 228 Cal.App.3d at p. 717.) The latter holds only that a prior action for administrative mandate, injunctive and declaratory relief and damages, finally decided and affirmed on appeal, is a bar to a subsequent inverse condemnation action seeking damages for the same taking alleged in the first action. (*Tensor Group* v. *City of Glendale, supra,* 14 Cal.App.4th at pp. 160-161.) We do not read *Tensor* as holding that a judgment on a petition for administrative mandate is res judicata in a subsequent inverse condemnation action, but only that a damage claim litigated with a mandate petition bars a subsequent claim for the same damages. Although it appears to us that *some* of the issues decided in a mandate proceeding might not be subject to relitigation in a subsequent inverse condemnation action (on a theory of collateral estoppel), that issue is not before us in this case.

subsequent takings trial. (See fn. 9, *ante*.) If, as Healing proposed in this case, the hearing on the mandate petition and the trial on the takings issues are held at the same time, the process might be more efficient for both the court and the parties and the res judicata problems would be avoided. We emphasize, however, that we do not decide in this case that any particular procedure or sequence of decisions is required, only that a trial is necessary.[10]

## DISPOSITION

The judgment is reversed in its entirety, and the matter is remanded to the trial court with directions to issue a writ of administrative mandate directing the Coastal Commission to refer Healing's permit application to the ERB for the ERB's prompt review and recommendations or, if there is still no ERB in existence, to disregard the County's proposed LCP on the ground the County has abandoned any intent it might once have had to become a permitting authority. After the Commission responds to the writ, the trial court shall take such further action as necessary to carry out the views expressed in this opinion. Healing is awarded his costs of appeal.

Spencer, P. J., and Masterson, J., concurred.

A petition for a rehearing was denied March 16, 1994, and respondent's petition for review by the Supreme Court was denied June 30, 1994.

---

[10]Of course, we do not mean to preclude a motion for summary adjudication of issues or summary judgment if a particular case permits that sort of resolution.