89 Cal.Rptr.2d 52 (1999)
75 Cal.App.4th 249
MILLS LAND & WATER COMPANY, Plaintiff and Appellant,
v.
The CITY OF HUNTINGTON BEACH, Defendant and Respondent.
No. G020490.
Court of Appeal, Fourth District, Division Three.
September 27, 1999.
Rehearing Granted December 14, 1999.
*53 Hill, Farrer & Burrill, Arthur B. Cook and Dean E. Dennis, Los Angeles, for Plaintiff and Appellant.
Moore, Rutter & Evans and Mark D. Rutter, Long Beach, for Defendants and Respondents.

OPINION
SEYMOUR, J.[*]
In this case, we consider whether Mills Land & Water Company (Mills) pleaded *54 sufficient facts that the City of Huntington Beach (the City) so unreasonably delayed Mills from developing its property that the result has been a temporary taking. We conclude it has. We reverse the judgment dismissing Mills' complaint after the City's demurrer was sustained without leave to amend.

* * *

Historical Background
This action concerns approximately 51 undeveloped acres located in the City. The land was purchased by Mills almost a century ago. It is located on the inland side of Pacific Coast Highway across from Huntington Beach State Park. Because the property is located in a coastal zone (Pub. Resources Code, § 30103),[1] it is subject to development restrictions imposed by the California Coastal Act of 1976 (§ 30000 et seq., the Act).
In 1965, the State of California acquired from Mills an approximately 28acre piece of the 51 acres for freeway use (the Caltrans parcel). After abandonment of its coastal freeway plan, the state granted Mills an option to reacquire the Caltrans parcel. As a result, Mills now owns 23 acres outright (the Mills parcel) and holds an option interest in the 28-acre Caltrans parcel.[2] The Caltrans parcel includes an approximately seven-acre parcel (the Caltrans VSC parcel), which is designated for "visitor-serving commercial" uses and development in the City's zoning and in its Land Use Plan (LUP) which has only recently been approved by the California Coastal Commission (the Commission). Mills contends that by taking almost 20 years to produce an LUP acceptable to the Commission, the City caused a temporary taking of its property for which it should be compensated.

California Coastal Act Requirements
The Act establishes a comprehensive framework for coastal planning. (§ 30000 et. seq.) It requires each local government having coastal property within its territory to prepare a Local Coastal Program (LCP) to govern development in its coastal zone. (§§ 30108.6 & 30510.)
An LCP is composed of two parts: an LUP, which functions as the general plan for the coastal zone; and the Local Implementation Plan (LIP), which includes the zoning, zoning maps, and implementing actions for the coastal zone. (§§ 30108.5 & 30108.6.) Local governments, such as the City, are required to adopt an LUP first, and then an LIP, and forward each in turn to the Commission for certification that they are consistent with the Act's goals and policies. The Commission may grant or deny certification, or it may grant certification subject to the local agency accepting the Commission's proposed modifications. (See Cal.Code Regs., tit. 14, § 13500 et seq.)
Until an LCP is adopted by the local government and certified by the Commission, the Commission has concurrent jurisdiction with the local government for granting permits to develop in the coastal zone. (§ 30600, subds.(b), (c) & (d).) After the LCP is certified, permit authority reverts to the local government. (§§ 30519 & 30600, subd. (d).) The Act provides for submission of the LIP to the Commission within 30 days after the certification of an LUP, but in no event later than January 1, 1984. The Commission is authorized to extend the deadline for a period not to exceed one year. (§ 30517.)

Standard of Review
It is with this background in mind that we turn to the pleadings. In reviewing *55 a dismissal after demurrer is sustained without leave to amend, we must assume the truth of all facts properly pleaded by the plaintiff, as well as those which are judicially noticeable. (Blank v. Kirwan (1985) 39 Cal.3d 311, 318, 216 Cal.Rptr. 718, 703 P.2d 58.) The facts we rely upon are taken from the third amended petition for writ of mandate and complaint and the various documents of which the trial court took judicial notice.

Facts
Mills alleges that in 1978 it applied to the City for an amendment to the City's general plan to accommodate development of the property for residential and commercial uses. The City declined to act on the application and postponed any decision to an indefinite future time. The reason given Mills was that the City's planning staff needed time to develop the LUP for the coastal element of the City's general plan. More than a year later, the City denied Mills' application. Mills was instructed to continue working with the planning staff to develop land use alternatives which the City might consider in its LUP.
In 1979, the California Department of Fish and Game (DFG) conducted a preliminary study in which it concluded the Mills parcel and most of the Caltrans parcel were restorable wetlands. From about 1979 to 1980, the City studied and held hearings on possible land use alternatives for its LUP. In connection with these proceedings, the City found that the location of the Mills parcel and the Caltrans parcel "`at the terminus of the major access route from inland areas to the beach makes [the site] especially appropriate for Visitor-Serving Commercial.'" The City submitted its LUP to the Commission for approval, but the Commission denied certification based upon the DFG wetlands study. In the alternative, the Commission approved certification of the LUP conditioned on the designation of, inter alia, all of the Mills parcel and most of the Caltrans parcel for "conservation" uses.
In August 1982, the City resubmitted its LUP, with minor changes, to the Commission for certification. In November, the Commission carved out of the LUP the coastal sector along the inland side of Pacific Coast Highway, which included the area depicted by DFG as wetlands, and certified the City's LUP as to the balance. This area, which included the Caltrans parcel and the Mills parcel, became known as the "White Hole area." In February 1983, DFG released its final report, which concluded that the Mills parcel and portions of the Caltrans parcel were "degraded but restorable salt marsh."
The City then waited until 1986 to adopt a revised LUP, which designated approximately seven acres of the Caltrans parcel for visitor-serving commercial uses and development. The remainder of the Caltrans parcel and all of the Mills parcel were designated in the LUP for "conservation." In October 1986, the Commission approved and certified the LUP submitted by the City for the White Hole area.
In 1988, the City began consideration of zoning changes necessary to bring the White Hole area zoning into conformance with the conservation designation in the LUP. It took two years for the City to draft the proposed zone changes which were finally adopted in February 1990 as zone change 88-18. The zone change approved by the City added a new zoning suffix "-CC," standing for "coastal conservation," to the zoning of the Mills parcel and most of the Caltrans parcel. In April 1990, the City transmitted zone change 88-18 to the Commission for review and certification.
In the meantime, in July 1989, Mills had applied to the City for approval of a lightindustrial office project on the Mills parcel. The application was consistent with the existing zoning on the Mills parcel. But Mills was informed by the City that the application would not be processed until it applied for, and obtained, an amendment *56 to the LUP because it designated the Mills parcel conservation. Mills was informed that so long as an inconsistency existed between the LUP's land use designations and the City's zoning, an inconsistency which the City itself created, the City would not process Mills' application. But, in 1988, Mills had been told by the City's planning staff that given the lengthy and controversial history of the proceedings involving the LUP and the wetlands issue, it would be futile for Mills to seek any change to the conservation land-use designation or to apply for permit to develop the Mills parcel and/or Caltrans parcel depicted as "restorable wetlands." Mills appealed the City's decision not to process its project application, but never received a response from the City on that appeal.
In May 1992, the Commission approved zone change 88-18 subject to the condition that the City also adopt a "conservation overlay" zoning which would require that Mills, as a condition of developing the seven-acre Caltrans VSC parcel, dedicate the remainder of the Caltrans parcel and all of the Mills parcel for protection of the disputed wetlands. This was despite the fact that the Caltrans VSC parcel contained no wetlands and the City and the Commission had already approved its visitor-serving commercial designation. The zone change was referred back to the City for its consideration of the conservation overlay condition.
Zone change 88-18 never became effective because the City failed to act on the Commission's suggested modifications within the six-month statutory deadline. Additionally, the City had been advised by its attorney that the modifications would violate the takings clause of the United States Constitution.
After another two-year delay, the City took action, reenacting zone change 88-18 with the proposed modifications previously recommended by the Commission. This zone change was sent to the Commission for review and certification.

Subsequent Procedural History
Mills filed this action in December 1994, while the zoning certification was pending before the Commission. The trial court sustained demurrers to the first and second amended petitions with leave to amend. After the City's demurrer to the third amended petition was sustained without leave to amend, this appeal followed.
While this lawsuit was pending, the Commission was still considering the certification of the City's zoning ordinance. In November 1995, the Commission again proposed substantial changes in the White Hole zoning plan. The proposed new zoning contained the prior requirement that Mills dedicate conservation easements for the public benefit over all the parcels except the Caltrans VSC parcel. In addition, the Commission included substantial changes intended to cure procedural deficiencies Mills claimed had made the 1994 zoning unconstitutional on its face.
In March and April 1996, the City adopted the Commission's proposed modifications, thus ending the process of conflicting decisions by the City and the Commission. The enactment of the 1996 zoning law mooted Mills' challenge to the validity of the 1994 zoning.

* * *
Mills is pursuing this appeal solely on the complaint's sixth cause of action for damages based on unreasonable delay in establishing the zoning. Therefore, the only issue before this court is whether Mills has pleaded facts sufficient to state a claim for a taking for unreasonable delay?
In Kavanau v. Santa Monica Rent Control Bd. (1997) 16 Cal.4th 761, 66 Cal. Rptr.2d 672, 941 P.2d 851, our Supreme Court explained the legal principles surrounding a claim of a "regulatory taking." We begin by briefly reiterating those principles. "The state and federal Constitutions prohibit government from taking private property for public use without just compensation. [Citations.] ... [T]he *57 United States Supreme Court [has] recognized that a regulation of property that `goes too far' may effect a taking of that property, though its title remains in private hands. In such a case, the property owner may bring an inverse condemnation action, and if it prevails, the regulatory agency must either withdraw the regulation or pay just compensation. [Citation.] Even if the agency withdraws the regulation, the property owner may have a right to just compensation for the temporary taking while the regulation was in effect. [Citation.] [¶] The United States Supreme Court has struggled to articulate a standard for when a regulation `goes too far' and effects a taking. The court has stated broadly that the takings clause is `designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' [Citation.]" (Id. at pp. 773-774, 66 Cal.Rptr.2d 672, 941 P.2d 851.)
As Kavanau pointed out, the courts traditionally identified two categories of regulatory action which might constitute a taking: a regulation which results in a permanent physical invasion of property, and a regulation which deprives a property owner of "`all economically beneficial or productive use of land' ... [Citation.]" (Kavanau v. Santa Monica Rent Control Bd., supra, 16 Cal.4th at p. 774, 66 Cal.Rptr.2d 672, 941 P.2d 851.) But more recently, it has been recognized that "[a] regulation, however, may effect a taking though, as is true here, it does not involve a physical invasion and leaves the property owner some economically beneficial use of his property. In Lucas [v. South Carolina Coastal Council (1992) 505 U.S. 1003, 1019, footnote 8, 112 S.Ct. 2886, 120 L.Ed.2d 798], the high court expressly rejected the `assumption that the landowner whose deprivation is one step short of complete is not entitled to compensation.'" (Kavanau v. Santa Monica Rent Control Bd., supra, 16 Cal.4th at p. 774, 66 Cal.Rptr.2d 672, 941 P.2d 851, original italics.)
We must consider whether Mills' allegations that the City's almost 20-year delay in adopting zoning, which permitted Mills to develop its property, are sufficient to state a claim for a temporary taking. In Chandis Securities Co. v. City of Dana Point (1996) 52 Cal.App.4th 475, 60 Cal. Rptr.2d 481, we considered whether the failure of the Dana Point electorate to approve a referendum on a specific plan for development of the Dana Point Headlands constituted a taking. We held it did not because the plaintiffs did not allege or offer proof that the city planning process had unduly delayed development of their property. Nonetheless, we cautioned, "[A]t some point, the city's interest in the orderly development of the Headlands must give way to plaintiffs' right to use their property for some economically viable purpose. Given the cost, the amount of effort and the length of time it takes to prepare and approve land use proposals, unnecessary delays in approving a proposed development or repetitive denials of specific plans complying with the city's general plan will amount to a taking requiring Dana Point to pay compensation to plaintiffs. Dana Point was incorporated in 1989 and adopted its current general plan in 1991. Consideration of the development proposal at issue here began in the latter part of 1992. After numerous hearings and revisions, the plan was finally presented to the city council in early 1994. The referendums further delayed a decision on the approval of the proposed plan until November 1994. While Dana Point may not have yet crossed the line between legitimate land use planning and inverse condemnation, it is undoubtedly very close to the edge." (Id. at p. 484, 60 Cal.Rptr.2d 481.) The alleged delay in the present case far exceeds that presented in Chandis.
The City contends Mills' claim is not ripe. The essence of its argument is that a property owner must first obtain a final determination of what use can be made of the property under the existing *58 zoning before a court can determine whether there has been a taking. The argument is irrelevant, given the nature of Mills' claim that the failure of the City to adopt zoning regulations within a reasonable time under which it could submit a meaningful development application constituted the taking.
A similar issue was considered in Healing v. California Coastal Com. (1994) 22 Cal.App.4th 1158, 27 Cal.Rptr.2d 758. In Healing, the plaintiff sought to build a house in Los Angeles County's coastal zone. He put his project on hold in 1979 after being told the Commission would not consider his application because his lot was in an environmentally sensitive area. He delayed pursuit of a permit until the county submitted its LUP to the Commission. In 1982, the county submitted its LUP to the Commission, which rejected it as inadequate. Four years later, the county revised its LUP and the Commission certified it, but the county did not submit the zoning portion of the LCP to the Commission. The county's LUP placed the plaintiffs property in a watershed, allowing some home construction subject to approval by an Environmental Review Board (ERB) to be established by the county. The plaintiff then obtained approval of his house, in concept, from the county and applied to the Commission for a permit. The Commission denied Healing's permit on the ground that since the county's LCP had not been certified, it was required to deny any project that might prejudice the county's ability to obtain certification. Since the county had not established the ERB, the Commission had no way of determining whether the plaintiffs home would adversely impact the LCP.
The Court of Appeal reversed the trial court's ruling that there had been no taking and remanded for a trial on the inverse condemnation cause of action. It rejected the Commission's argument that because there had been no final action, no "taking" of the property had occurred. It noted that even if the Commission ultimately issued a permit to the plaintiff, it might be liable for a regulatory taking for the interim period. (Healing v. California Coastal Com., supra, 22 Cal.App.4th at p. 1171, 27 Cal.Rptr.2d 758.)
The Healing court summarized the plaintiffs conundrum in these words: "The County has been trying since 1982 to obtain certification of its LCP, without success. Meanwhile, along comes poor Healing who, as directed by the Coastal Act, applies to the Coastal Commission for a permit to build his house, only to be told by the Commission that, because the Commission has not approved the County's LCP, the Commission can't say one way or the other whether Healing's house `could' affect the County's ability to obtain that certification and, as far as the Commission is concerned, its failure to act one way or the other means there has been no denial of a permit which, in turn, means Healing's complaints are not `ripe' for judicial reviewand may never be so." (Healing v. California Coastal Commission, supra, 22 Cal.App.4th at p. 1168, 27 Cal.Rptr.2d 758.) As in Healing, here the City cannot rely on its failure to adopt its LIP and attendant zoning to claim Mills' claim is not ripe.[3]
The City continues that despite its failure to adopt specific zoning, Mills could have obtained a final and authoritative determination of the type and intensity of development legally permitted on the subject property. It suggests Mills could have submitted a development application *59 to the City for its approval in concept and then pursued that application with the Commission. But Mills alleged it had been informed by the City in 1988 that it would be futile to seek any change to the "conservation" land use designation or to apply for permits to develop any part of its property depicted as "restorable wetlands." "The futility exception to the ripeness doctrine relieves a developer from submitting `multiple applications when the manner in which the first application was rejected makes it clear that no project will be approved.' [Citation.] When the regulatory authority has `drawn the line, clearly and emphatically,' as to the permissible use of the property, the developer is not required to submit additional development applications. [Citation.] The exception is narrowly construed and the burden of establishing it lies with the developer. [Citation.]" (Milagra Ridge Partners, Ltd. v. City of Pacifica (1998) 62 Cal.App.4th 108, 120, 72 Cal.Rptr.2d 394.) Whether it would have been futile for Mills to take the steps the City urges is a factual matter.
The City also argues Mills could have gone directly to the Commission for a development permit after the City adopted its LUP in 1986. But the Act required that the City give preliminary approval of any proposed development before the Commission could act on any application. (Cal.Code Regs., tit. 14, § 13052.) Even had Mills succeeded in getting preliminary approval from the City, it is unrealistic to think the Commission would have entertained such an application until the City had enacted the zoning portion of its LCP. Indeed, in Healing v. California Coastal Com., supra, 22 Cal.App.4th at page 1168, 27 Cal. Rptr.2d 758, the Commission refused to consider the plaintiffs application because the LCP had not been certified.[4]
The City concedes that it took almost 20 years to complete its LCP. For most of that period, Mills was forced to stand by while the City and the Commission procrastinated as to what, if any, development would be allowed. Mills' efforts to get a decision on land use included an application for a general plan amendment in 1978 for residential and commercial uses, which was denied by the City. Mills was told to wait for the LUP. Mills' next move came in 1989 when it applied for a light-industrial office project consistent with the existing zoning, but inconsistent with the "conservation" designation in the LUP. Mills appealed the denial, but his appeal was never processed. In 1991, Mills tried to develop the Caltrans VSC parcel consistently with the LUP. The City's response was to initiate a zoning proposal requiring Mills to preserve the balance of its property as open space.
The City argues Mills should have filed additional development applications, even though there was no zoning in place upon which to base an application. The City had an obligation to get its LCP in place within a reasonable time so that Mills could ascertain what potential permitted uses the City would allow. Whether Mills' conduct in not taking further steps to force the zoning issues to a final conclusion with the City was reasonable is a factual issue which cannot be resolved on demurrer. Similarly, determining whether the City's delay in processing and adopting its LCP was justified requires an evidentiary record.
The judgment is reversed and the matter remanded to the trial court. Appellant shall recover its costs on appeal.
SILLS, P.J., and RYLAARSDAM, J., concur.
NOTES
[*] Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.
[1] All statutory references are to the Public Resources Code unless otherwise indicated.
[2] The owner of an option to purchase land possesses a compensable property interest. (County of San Diego v. Miller (1975) 13 Cal.3d 684, 693, 119 Cal.Rptr. 491, 532 P.2d 139.)
[3] The City's reliance on MacDonald, Sommer & Prates v. Yolo County (1986) 477 U.S. 340, 106 S.Ct. 2561, 91 L.Ed.2d 285 is also misplaced. In MacDonald, the Supreme Court held that absent a final and authoritative determination by the county planning commission as to how it will apply the regulations at issue to the property in question, the court could not determine whether a "taking" had occurred or whether the county failed to provide "just" compensation. (Id. at p. 348, 106 S.Ct. 2561.) But MacDonald did not involve a claim of unreasonable delay in adopting those regulations.
[4] The City also contends that Mills could have gone directly to the Commission without preliminary approval by the City under a procedure that authorizes waiver of preliminary approval for good cause under certain exceptional situations. (Cal.Code Regs., tit. 14, §§ 13052 & 13053.) The City fails to explain whether any of these exceptional situations apply or why the Commission would waive City preliminary approval under the facts of this case.